(No. 26532.— )

Ernest J. Seibert, *vs.* Ralph E. Seibert *et al.* Appellees.—(Ernest J. Seibert *et al.* Appellants.)

*Opinion filed March 17, 1942—Rehearing denied May 13, 1942.*

Murray & Miller, Charles R. Myers, and Matthew E. Murray, for appellants.

Ben H. Townsend, for appellees.

Mr. Justice Wilson delivered the opinion of the court:

A decree of the circuit court of Wabash county dismissed the complaint of plaintiff Ernest J. Seibert seeking to remove a deed from defendants James F. and Maria E. Seibert to defendant Ralph E. Seibert to 40 acres of land

in Wabash county and granted the relief sought by the defendant and counter-claimant, Ralph Seibert, adjudging him the owner of the property. Plaintiff prosecutes a direct appeal, a freehold being necessarily involved.

February 2, 1925, James F. Seibert borrowed $2100 from the Federal Land Bank of St. Louis and secured the indebtedness by a mortgage on 120 acres of land in Wabash county, a mile and a half northeast of Lancaster, and 20 acres in Lawrence county. Included was the 40-acre tract in controversy. February 21, 1927, Seibert executed a warranty deed, conveying the 40 acres to his son Ernest. The conveyance was made subject to $600 of the mortgage indebtedness which, according to the deed, the grantee assumed and agreed to pay as a part of the purchase price. When or how Ernest obtained possession of the deed is not disclosed. The same day, Seibert executed another deed conveying 60 acres in Wabash county and the 20 acres in Lawrence county to his son Ralph. Of the 60 acres in Wabash county, 20 acres were unencumbered. This conveyance was made subject to the mortgage indebtedness to the extent of $900. The deed recited that Ralph assumed and agreed to pay the sum named as a part of the purchase price. Ralph was present when the deed to him was executed. Thereafter, he turned over to his father, from time to time, funds to pay the taxes on the 80 acres conveyed to him and, also, his portion of the payments due on the debt to the land bank. Ralph caused the deed to him to be recorded April 29, 1929. It appears that Ernest turned over sufficient moneys to his father to pay taxes for the years 1926, 1927 and 1928 on the 40 acres conveyed to him, the last payment of taxes being on April 29, 1929, and, also, until 1929, to meet the payments due on $600 of the mortgage indebtedness. James Seibert, it is admitted, continued in possession and control of and managed the entire farm during these years. December 5, 1929, Ernest, then residing at Mt. Carmel, wrote a letter to his father

at Lancaster announcing, in part: "by the way I have paid the last cent on the land taxes and all. anytime you are down will give back the slip of paper sorry if it causes you any more trouble but this is final." By 1933, James Seibert was experiencing considerable difficulty in meeting his mortgage payments and taxes, and foreclosure of the farm was imminent. Ralph, employed by a railroad company at Mattoon, was summoned home and acquainted with his father's precarious situation. March 15, 1933, the parents executed and delivered to Ralph a warranty deed conveying the 40 acres previously conveyed to Ernest, and an additional 40 acres in Wabash county. This deed was caused to be recorded the next day, March 16, 1933. Ralph was then the record owner of the entire farm, namely, the 140 acres in Wabash county and, also, the 20 acres in Lawrence county. This deed recited that it was subject to a mortgage held by the Federal Land Bank of St. Louis, the amount of the debt then being $1000. It appears that Ralph had advanced money to his father from time to time, that he cancelled all claims and debts owed him by his father and, in addition, satisfied delinquent payments on his father's note to the bank. Subsequently, all payments of principal and interest due on the mortgage debt were paid by Ralph and he has paid all taxes assessed against the property, excepting only those for the year 1939. When the 1939 taxes became payable Ralph remitted the amount assessed against the entire 140 acres in Wabash county but was advised by the collector that Ernest had already paid the taxes for 1939 on the 40 acres deeded to him in 1927. A refund of this amount was, accordingly, made to Ralph.

In the meantime, Sheldon Seibert, a third son of James F. Seibert, returned to Lancaster from Detroit where he had been employed for eighteen years. Sheldon consulted with Ralph with respect to moving into the dwelling located on land owned by Ralph by virtue of the deed to the latter dated February 21, 1927. Conformably to an agreement

474

between them, Sheldon moved on to the farm in March, 1933, occupied the house and proceeded to plant crops on such portions of the entire farm as he desired. According to Sheldon, he rented the land from his brother as a tenant farmer and agreed to pay him one third of the grain and one half of the hay as rent. Sheldon was unaware of any claim on the part of Ernest to ownership of the 40 acres in controversy. Likewise, he did not know that his father had made deeds to Ralph and Ernest in 1927. Shortly thereafter, in the latter part of June, 1933, Sheldon was called back to work in Detroit. He then made arrangements with Ernest to take care of his crops and other property for him. Ernest harvested and turned over to Ralph one third of the crops as rent. The former continued to live on the farm until 1940, paying and delivering to Ralph the one-third rental of all crops raised upon the farm, including the 40 acres in controversy, until he commenced this action. Upon notice and demand from Ralph, Ernest then left the property.

December 9, 1939, Ralph Seibert and his wife executed an oil and gas lease to H. K. Riddle covering the entire farm. Thereafter, Riddle assigned the lease to the Seaboard Oil Company of Delaware. March 7, 1940, thirteen years after the execution of the deed from James Seibert to him, Ernest caused it to be recorded. March 11, he paid the taxes on the 40 acres, not having paid taxes thereon for over eleven years. March 13, Ernest wrote to Ralph as follows: "I shure hate this thing has happened and would like to have it settled some way as I have no rest as it is. Now if you want to split 50/50 on the oil & gas rights, we will fix out the deeds so there will be a clear title for you. Or I will let this man [N. E. Biffle] have an agreement. He will get the lease if he gets a clear title for me which he says he will at his [Biffle's] own expense. Now I would far rather settle this thing out of court. Aspin & Riddle was here the other day & said they were

sewing you through Federal court at Danvill. So think it over & let me know before I turn it over to this fellow." March 18, plaintiff and his wife executed an oil and gas lease on the 40 acres in question to Biffle who, in turn, sold it to the Seabord Oil Company. May 2, 1940, plaintiff and his wife, by an unrecorded contract, conveyed a portion of the oil, gas and other mineral interests in and to the 40 acres to Charles R. Myers and Biffle.

July 13, 1940, Ernest Seibert filed his complaint in the circuit court of Wabash county claiming to be the owner in fee simple of the 40 acres conveyed to him in 1927 and seeking to have the deed of March 15, 1933, to Ralph Seibert cancelled and declared void, to the extent it covers the 40 acres, and removed as a cloud upon his (Ernest's) title. The defendants, Ralph Seibert, his wife, James F. Seibert and his wife, answered that the deed to plaintiff of February 21, 1927, was executed upon the condition that he pay all taxes and also assume and pay $600 of the mortgage indebtedness owing to the Federal Land Bank of St. Louis; that the deed was not delivered to Ernest for the purpose of transferring title to him and was not accepted by him; that, as narrated, he later renounced and abandoned all right and interest, and, by reason thereof, the title to the property did not vest in him; that because of plaintiff's failure and refusal to comply with the conditions upon which the deed was executed to him the title remained or revested in the grantor, James F. Seibert, and that, accordingly, on March 15, 1933, the title to the 40 acres in dispute was in the grantor, who, for good and valuable consideration, conveyed this tract, together with other land, to Ralph. Defendants also pleaded that by virtue of the recording laws of the State the deed to Ralph was entitled to priority; that, having paid seven years' taxes, Ralph was entitled to avail himself of section 6 of the Statute of Limitations; that plaintiff was estopped to deny Ralph's title, and, finally, that plaintiff was barred by

*laches* from asserting any supposed claim of title. Defendant Ralph Seibert also filed a counterclaim seeking to have the deed from his father to Ernest cancelled from the record as a cloud upon his (Ralph's) title. This defendant filed a second counterclaim against plaintiff, Biffle, the Seaboard Oil Company of Delaware, and Charles R. Myers, seeking to have the lease from Ernest to Biffle and its assignment declared null and void and, further, a declaration that Ernest, Biffle and Myers have no interest in and to the oil or gas and other minerals under the property. Plaintiff replied to the answer and the counterclaims, denying their material averments and allegations. Myers and Biffle answered the counterclaims denying that defendant Ralph Seibert had any right, title or interest in the premises involved and asserting, on the other hand, that the oil and gas lease from plaintiff to Biffle and its assignment to the Seaboard Oil Company were valid. The cause was heard by the court and a decree rendered (1) denying plaintiff the relief sought and dismissing his complaint for the want of equity, (2) adjudging Ralph Seibert the owner in fee simple of the 40 acres in question by virtue of the deed of March 15, 1933, subject only to any valid oil and gas lease upon the property executed by Ralph Seibert and to any valid existing mortgage indebtdness, (3) cancelling and expunging the record of the deed of February 21, 1927, from James F. and Maria Seibert to plaintiff, (4) cancelling and expunging the record of the oil and gas lease executed by plaintiff and his wife, as lessors, to Biffle, as lessee, under date of March 18, 1940, and (5) adjudging that plaintiff, Biffle and Myers had no right, title, interest or claim to the oil and gas in and underlying the property. This appeal followed.

Additional facts and circumstances merit scrutiny. At the time of the trial defendants James F. Seibert and his wife were both more than eighty years of age and in feeble health. James Seibert's testimony was taken by

deposition. It suffices to observe that Seibert and his wife had but little recollection, if any, of circumstances attending the execution of the deeds on February 21, 1927. James Seibert's testimony warrants the conclusion, however, that defendant Ralph Seibert was not advised of the execution of the deed to Ernest. Ernest testified that when his father gave him the deed to the 40 acres he did not inquire about giving a deed to Ralph to a part of the farm at the same time, "I don't know for sure. I never asked him." Ernest also stated that when his father executed the deed he said: "Don't have it recorded, to let it go. I never did have it recorded. He said not to." On cross-examination, to a query as to whether he knew Ralph had paid the taxes since 1933, plaintiff answered, "It was nothing to me." He also said that he did not recall any conversation with Ralph claiming ownership to any part of the 140 acres at any time from March 1, 1933, to about the time he instituted this action, and that he knew Ralph had a deed on record covering the 40 acres. Ralph testified that about March 1, 1940, Ernest told him "I have a deed to the forty acres and if you will give me a deed to half of it, I will straighten it up, or if you give me one-half of the oil rights under the whole forty, I will straighten the thing up for you."

To obtain a reversal of the decree, plaintiff makes the contention, among others, that the chancellor erred in holding that the deed of February 21, 1927, from James F. and Maria Seibert to him was not delivered and accepted. He insists that there was both an effectual delivery and acceptance of the deed. On the other hand, defendants maintain that there was no legal and sufficient delivery and acceptance of the deed. The issue thus made in the trial court and there decided adversely to plaintiff is the only question requiring consideration and disposition. It is settled that to constitute a conveyance there must be not only a delivery of the deed by the grantor but also an acceptance

by the grantee and it must affirmatively appear that the grantor's intention was that the deed should pass title at the time and that he should lose all control of it. (*Newton* v. *Village of Glen Ellyn*, 374 Ill. 50; *Sellers* v. *Rike*, 292 id. 468; *Pemberton* v. *Kraper*, 289 id. 295; *Hill* v. *Kreiger*, 250 id. 408.) It follows that placing a deed in the hands of a grantee does not constitute delivery where it is shown the intention of the parties was that it was not to become operative immediately and where such intention is evidenced by continued acts of ownership and operation. (*Redmond* v. *Gillis*, 346 Ill. 223; *Kavanaugh* v. *Kavanaugh*, 260 id. 179; *Pratt* v. *Griffin*, 184 id. 514.) Generally, where a deed imposes an obligation upon or creates any liability against a grantee an acceptance cannot rest upon a mere presumption but must be of an affirmative character. (*Huber* v. *Williams*, 338 Ill. 313; *Sellers* v. *Rike, supra; Thompson* v. *Dearborn*, 107 Ill. 87; *Hill* v. *Kreiger, supra*.) Similarly, where the facts neither show an actual acceptance nor justify a presumption of law that the deed has been accepted, the title does not pass. (*Huber* v. *Williams, supra; Egan* v. *Egan*, 301 Ill. 124; *Hill* v. *Kreiger, supra; Dagley* v. *Black*, 197 Ill. 53; *Moore* v. *Flynn*, 135 id. 74.) In particular, the mere manual possession of a deed by a grantee is not necessarily an acceptance thereof. (*Redmond* v. *Gillis, supra; Hollenbeck* v. *Hollenbeck*, 185 Ill. 101; *Pratt* v. *Griffin, supra*.) It follows necessarily that where facts and circumstances are disclosed manifesting a dissent to acceptance, a deed will not operate by a presumed assent and, accordingly, becomes inoperative.

Application of the law to the factual situation leads irresistibly to the conclusion that there was no delivery to and acceptance of the deed by plaintiff. It is conceded that for several years after its execution in 1927 the grantor remained in possession of the land and exercised complete control over it. So far as the record discloses, plaintiff did not in any way assume or attempt to assume dominion over

the property deeded to him. In 1929, he advised the grantor, in writing, that he would no longer pay taxes on the land or meet any part of the mortgage debt, and indicated, in unmistakable terms, his intention not to be bound by the deed. He did not record the deed the first three years, assigning as his reason therefor that his father had directed him to not place it of record. The grantor's retention of possession and control of the property, his directions with respect to the deed and plaintiff's acquiescence therein, plaintiff's failure and refusal to pay taxes and instalments on the mortgage debt, particularly when his letter of December 5, 1929, is considered, demonstrate that he did not accept the deed and that it was inoperative as a conveyance to him. Furthermore, the evidence discloses that for seven years he occupied the property he now claims to own and paid rent regularly and without objection to the record owner of the title, namely, his brother Ralph. Thirteen years after the execution of the deed,— subsequent to the discovery of oil in the vicinity of the property,—plaintiff was induced to place the deed of 1927 on record. His belated claim of title is obviously an afterthought and it is apparent that his present assertion of ownership is the direct result of negotiations with defendant Biffle, the real party in interest in this litigation. In short, until oil was discovered plaintiff never assailed Ralph's ownership of the property. His conduct estops him from asserting claim to the title. Again, Ralph testified that he knew nothing about the deed to plaintiff made in February, 1927, and the record tends to sustain his claim of lack of knowledge. So far as plaintiff is concerned, the latter does not even claim to have asserted any title in himself during the thirteen years nor to have advised Ralph of his possession of the unrecorded deed. Indeed, we find it difficult to conceive of stronger facts and circumstances manifesting an intention to dissent from acceptance of a deed than those here present.

Defendant Biffle was fully aware, both directly and constructively, of the fact that Ralph Seibert was the owner of record of the entire farm, including the 40 acres, the deed to Ralph covering the 40 acres in litigation having been of record since March 16, 1933. The oil lease from Ralph to Riddle was also of record when Biffle appeared on the scene and eventually obtained an oil lease from plaintiff. Manifestly, he stands in no better position than his lessor, the plaintiff.

The decree of the circuit court is affirmed.

*Decree affirmed.*